IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| KIM A. DAY and TERESA DAY, | |
| Plaintiffs, | **No. 4:05-cv-00269-JEG** |
| vs. | |
| COVENTRY HEALTH CARE OF IOWA, INC., | **O R D E R** |
| Defendant. | |

This case has been submitted to the Court for judgment on a stipulated record. Plaintiffs

Kim and Teresa Day are represented by David Roth. Defendant Coventry Health Care of Iowa,

Inc. ("Coventry"), is represented by Michael Thrall and Debra Hulett. The matter came on for

hearing March 27, 2006. The matter is fully submitted and ready for ruling.[1]

## SUMMARY OF MATERIAL FACTS

Kim and Teresa Day reside in Winterset, Iowa. Mr. Kim Day ("Day") was injured in a

car accident November 2, 2002, that severely crushed his feet. Day underwent two attempted

---

[1] As a preliminary matter, the Court notes that this action was originally filed in state
court, with one claim for breach of contract brought by both Kim and Teresa Day. Upon
removal, Plaintiffs conceded that ERISA preempts the breach of contract claim and that Mr. Day
is the only relevant party for this Court's consideration. However, Plaintiffs did not file an
amended complaint.

The Court's jurisdiction depends on the applicability of ERISA, as the parties are not
diverse. Neither party contests that ERISA governs the dispute, and the Court similarly con-
cludes that the pending claim is appropriately characterized as a claim for wrongful denial of
benefits arising under 29 U.S.C. § 1132(a)(1)(B).

There is no allegation that Ms. Day seeks to recover benefits due to her under the Plan, to
enforce her rights under the Plan, or clarify her rights to benefits under the Plan. Accordingly,
she lacks standing to pursue a claim under section 1132(a)(1)(B) and must be dismissed as a
party to the pending action.

arthrodesis of the subtalar joint performed by standard techniques.[2]  The first, in January 2004, involved donor bone tissue.  The second, in July 2004, involved an autograft and two-screw fixation procedure using bone tissue from Day's hip.  Although Day complied with the post-operative care, neither procedure succeeded in uniting the subtalar joint.

Day's physician, Dr. Charles Saltzman, recommended using an Osteogenic Protein-1 (OP-1) implant, which was the only such product on the market.[3]  Dr. Saltzman is a professor of orthopaedic surgery and biomedical engineering at the University of Iowa Hospitals and Clinics and has access to OP-1.

Kim and Teresa Day entered into an insurance contract with Coventry for payment of medical benefits on December 9, 2003, as part of an employee welfare benefit plan ("Plan") issued by Waldinger Corporation, Day's employer.  Day claims that although he has complied with the terms of the contract, Coventry has not authorized payment for the OP-1 implant. Coventry initially denied Day's request for preapproval of the OP-1 implant December 16, 2004, though Coventry did approve coverage of a related procedure for hardware removal and subtalar arthrodesis.  Day was informed of this first benefits decision by phone December 16, 2004, and by letter the following day.

---

[2] The relevant medical terminology in this case is defined as follows:
Arthrodesis: "The stiffening of a joint by operative means."  Stedman's Medical Dictionary 149 (27th ed. 2000).
Subtalar: beneath the ankle bone.  Id. at 1714, 1784.
Autograft: "tissue or organ transferred into a new position in the body of the same individual."  Id. at 172.

[3]According to Coventry's Health Care Technology Assessment, osteogenic proteins, or bone morphogenic proteins, "are a family of bone-matrix polypeptides isolated from a variety of mammalian species" implanted to induce growth of new bone tissue (Stipulated R. 84).

According to Coventry, it denied coverage for the OP-1 implant because the procedure is "experimental or investigational."  The Plan excludes from coverage such procedures, which are defined as follows:

> A health product or service is deemed experimental (or investigational) if one or more of the following criteria are met:  Any drug not approved for use by the FDA . . . Any health product or service that is subject to Investigational Review Board (IRB) review or approval; Any health product or service that is the subject of a clinical trial that meets criteria for Phase I, II, or III as set forth by FDA regulations; Any health product or service that is not considered standard treatment by the medical community, based on clinical evidence reported by peer-review medical literature and by general recognized academic experts.

(Stipulated R. 75-76.)

Dr. Saltzman sent a letter to Coventry dated December 30, 2004, voicing disagreement with the decision to deny coverage of the OP-1 implant.  Coventry considered this letter as a pre-service final appeal and scheduled a hearing for February 2, 2005.  Day was notified he could present his case with assistance of counsel and that he could submit supplemental materials and question committee members.

Kim and Teresa Day appeared at the hearing with counsel and presented evidence that OP-1 implantation is not an experimental procedure.  Counsel said Day has only three remaining treatment options as to his right ankle: the OP-1 implant, a metal wedge insert, or amputation.[4]

Day's supplemental materials included correspondence from Stryker Bio-tech, the manufacturer of OP-1, explaining that the FDA approved the OP-1 implant on October 17, 2001, as a "humanitarian use device" when other treatment failed.  He also provided information, including samples of policy manuals, that other contract payors in Coventry's position (Medicare, Aetna, Wellpoint, and Blue Cross Blue Shield) have approved coverage for OP-1 implants.  Finally,

---

[4] The record indicates amputation of Day's left foot appears likely, though that treatment is not the subject of the present case.

Day presented documentation that another Coventry-affiliated health plan has authorized an OP-1 implant as an exception to its policy terms.

Teresa Day said in the hearing that her husband was not inclined to take pills before the accident but now takes pain medication regularly, which affects his memory.  Kim Day expressed his desire to support his family again and return to near-normal functioning with reduced pain.

The appeal committee consisted of Deanna Gray, Vice President and Committee Chair; Gary Busack, Vice President, Network Management; and Dr. Nelson Braslow, M.D., who is not employed by Coventry but works for an affiliated plan in Pennsylvania.  Dr. Braslow appeared by phone.  A Coventry appeals coordinator, in-house counsel, and an administrative assistant were also present.  The committee reconvened the following day, February 3, 2005, and unanimously voted to uphold the denial of benefits.  According to the appeal file, the committee "held a lengthy discussion and re-evaluated the Plan documentation," including the Days' oral presentations and supplemental materials.  Day received a letter, dated February 4, 2005, explaining the decision.

Day contends Coventry's failure to remit payment for his OP-1 implant constitutes an improper denial of benefits and seeks judicial review of that decision.  The present action was originally filed in the Iowa District Court for Madison County on March 30, 2005, alleging a breach of contract claim.  Coventry admits that Day has exhausted his remedies under the Plan but asserts that his common law claim is preempted by ERISA and removed the case on May 10, 2005, pursuant to the federal jurisdiction of this Court under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1), (f).  Day admits the present action involves an ERISA plan, and the breach of contract claim is preempted by ERISA.  As noted, the parties agreed to submit the case on a stipulated record.

## APPLICABLE LAW AND DISCUSSION

**I.      STANDARD OF REVIEW**

Although Day initially stated his claim as a breach of contract claim, he conceded that his claim is preempted by ERISA, and therefore the appropriate claim is, as stated in the Notice of Removal, governed by 28 U.S.C. § 1132(a)(1)(B).  That section of  ERISA permits a plan bene-ficiary to bring a civil action to recover benefits or enforce his rights under the plan.  29 U.S.C. § 1132(a)(1)(B) (2000); Heaser v. Toro Co., 247 F.3d 826, 833 (8th Cir. 2001).  In actions challenging a denial of benefits under § 1132(a)(1)(B), the correct standard of review is *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  If the plan vests discretionary authority in the administrator or fiduciary, the Court reviews the benefits decision for abuse of discretion.  Id.  There are, how-ever, exceptions to this rule:  The district court maintains de novo review when a fiduciary inter-prets the law, Meyer v. Duluth Bldg. Trades Welfare Fund, 299 F.3d 686, 689 (8th Cir. 2002), and a sliding scale of review applies in the presence of procedural irregularities or a conflict of interest resulting in a breach of fiduciary duty.  Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir. 1998).

Day urges first that de novo review is appropriate because the Plan did not grant discre-tionary authority to an administrator or fiduciary.  In fact, he argues the Plan has no administra-tor.  In the alternative, assuming this Court finds the Plan contains an appropriate grant of discre-tionary authority, Day claims procedural irregularities and a conflict of interest exist, justifying the application of a less-deferential standard of review.

**A.      Standard of Review - Language Vesting Discretionary Authority**

Under 29 U.S.C. § 1105(c), "an ERISA plan may authorize the plan sponsor to delegate the sponsor's discretionary authority to determine eligibility for benefits or to construe the terms

5

of the plan." <u>McKeehan v. Cigna Life Ins. Co.</u>, 344 F.3d 789, 793 (8th Cir. 2003) (citing 29

C.F.R. § 2509.75-8).  The plan must contain "explicit discretion-granting language" to confer the

appropriate authority to an administrator or fiduciary.  <u>Parkman v. Prudential Ins. Co. of</u>

<u>America</u>, 439 F.3d 767, 772 (8th Cir. 2006) (per curiam).

 An explicit grant of discretion is required because "insurers are accustomed to de novo

judicial review of their decisions." <u>McKeehan</u>, 344 F.3d at 793.  Accordingly, a plan sponsor

does not trigger an inference of discretionary authority merely by purchasing a standard group

insurance policy. <u>Id.</u>  The policy or other plan documents must contain explicit language of

discretion before the ERISA deferential standard of review is triggered. <u>Id.</u>

 Day argues the Plan failed to reserve such discretionary authority in a fiduciary or admin-

istrator, and therefore this Court should review Coventry's denial of benefits de novo.  Day

grounds his arguments in this regard in the language of section ten of the Plan, "Resolving Com-

plaints and Grievances."  He claims this section conveys no discretionary authority because it

merely directs members to customer service representatives and explains the appeal process,

using permissive language.  For example, the section states the Plan provides members with

procedures to resolve complaints and "opportunit[ies] to ask Us to review any matter related to

Covered Services" including "denial of care/services/claims."  Therefore, Day claims the Plan

does not confer authority to determine benefits eligibility or construe Plan terms, but instead

only permits its members to issue complaints and appeals.

 Coventry does not suggest that section ten of the Plan grants it discretionary authority.

Instead, Coventry claims the Plan very clearly confers authority to construe the Plan term

"experimental or investigational" and refers the Court to section 6.1.7 of the Plan, dealing with

exclusions and limitations.  The Plan there states services are not covered that "we determine, *in*

*our sole and absolute discretion* to be Experimental or Investigational."  (Stipulated R. 49

(emphasis added).)  As previously noted, the Plan later defines experimental or investigational

services as those subject to Investigational Review Board (IRB) review or approval; the subject of a clinical trial that meets FDA regulations for Phase I, II, or III; or not considered standard treatment by the medical community.  (Stipulated R. 75-76.)  According to Coventry, this language authorizes its construction of the Plan term in dispute in this case and entitles it to abuse of discretion review.

Day did not respond to Coventry's argument in his reply brief.  In oral argument, counsel stated that the language in section 6.1.7 is not an explicit designation of discretionary authority because it fails to provide with appropriate specificity *who* has that discretion.  The Eighth Circuit, however, has previously determined that "[t]he plan need not spell out in intricate detail who has the discretion other than to specify that those charged with implementing it will have such discretion."  Butts v. Continental Cas. Co., 357 F.3d 835, 838 (8th Cir. 2004) (applying abuse of discretion review when plan vested authority in "the Administrator and other Plan fiduciaries").  As noted above, section 6.1.7 states that whether a service is experimental or investigational is determined solely by what "we" decide.  References in the Plan to "We" or "Us" refer to the Health Plan, which in turn refers to Coventry.  (Stipulated R. 77, 80.)  This language names the vested party with greater specificity than the language found adequate by the Eighth Circuit in Butts, and accordingly it sufficiently identifies the intended holder of the discretionary authority.

The Court notes, however, that in many cases where the language of the Plan is found sufficient to grant discretionary authority, the language is a general grant of discretion to interpret all Plan terms, while the language at issue in this case relates to construction of the single term "experimental or investigational."  See, e.g., Butts, 357 F.3d at 838 ("Plan fiduciaries have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to benefits in accordance with the Plan"); McKeehan, 344 F.3d at 792 ("full and exclusive authority to control and manage the Plan, to administer claims, and to interpret the

Plan"). The Court of Appeals has not always required such general language, however, when the grant of authority relates to the provision of the Plan at issue. See Ferrari v. Teachers Ins. and Annuity Ass'n, 278 F.3d 801, 806 (8th Cir. 2002) (finding plan language that "specifies that the employee must provide written proof of continued disability . . . and that such proof must be satisfactory to TIAA" warranted abuse of discretion review where the plaintiff's eligibility for disability benefits was the issue in the case). The "experimental or investigational" term is the provision at issue in this case, and "sole and absolute discretion" is sufficiently explicit discretion-granting language.

Day further contends the Plan could not have reserved discretionary authority in an administrator or fiduciary because the Plan failed to name an administrator. While Day maintains the Plan has no administrator, Coventry asserts that it is both the insurer and the administrator. Under ERISA, an administrator is "the person specifically so designated by the terms of the instrument under which the plan is operated; [or] if an administrator is not so designated, the plan sponsor." 29 U.S.C. § 1002(16)(A)(i)-(ii).

Day appears to be correct that the Plan does not specify an administrator identified as such; however, in light of the statutory definition, his contention that the Plan has no administrator is not credible because in the absence of a designated administrator, the sponsor fills that role. The Plan sponsor is Waldinger Corporation, but neither party asserts that Waldinger is the administrator.[5] Coventry does not point to any Plan language naming it as the administrator but asserts that being the administrator and the insurer is not grounds for automatic application of a sliding scale standard of review.[6]

---

[5] Day also refers to the inapplicability of de facto administrators, a concept considered and rejected by the District of Minnesota. Hillstrom v. Kenefick, 2005 WL 2271932 at *3 (D. Minn. Sept. 19, 2005). Coventry does not argue the Plan provides for de facto administrators.

[6] Although Day denies the existence of a Plan administrator, he treats Coventry as the administrator for purposes of his argument on the sliding scale standard of review. The sliding scale standard of review is discussed infra at Part I.B.

Even if Coventry is not the administrator, it is still entitled to the more deferential abuse of discretion review if it is a fiduciary.  Firestone Tire and Rubber Co., 489 U.S. at 115 (review is de novo "unless the benefit plan gives the administrator *or fiduciary* discretionary authority to determine eligibility for benefits or to construe the terms of the plan") (emphasis added)).  Under ERISA, a fiduciary is one who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . [or] has any discretionary authority or discretionary responsibility in the administration of such plan."  29 U.S.C. § 1002(21)(A).  Thus, the statute "imposes fiduciary status on those who exercise discretionary authority, regardless of whether such authority was granted," as well as upon "those individuals who have actually been granted discretionary authority, regardless of whether such authority is ever exercised."  Olson v. E.F. Hutton, 957 F.2d 622, 625 (8th Cir. 1992).

Discretion is key to determining fiduciary status, as a fiduciary by definition exercises more than purely ministerial functions.  Kerns v. Benefit Trust Life Ins. Co., 992 F.2d 214, 217-18 (8th Cir. 1993); 29 C.F.R. § 2509.75-5; see also Maniace v. Commerce Bank of Kansas City, 40 F.3d 264, 267 (8th Cir. 1994) ("Clearly, discretion is the benchmark for fiduciary status under ERISA"); Johnston v. Paul Revere Life Ins. Co., 241 F.3d 623, 632 (8th Cir. 2001) (same).  This discretion need not be universal; however, one can be a fiduciary only "with respect to the particular area in question."  Maniace, 40 F.3d at 267; see also Kerns, 992 F.2d at 217 ("Fiduciary status under § 1002(21)(A) is not 'an all-or-nothing concept. . . .  [A] court must ask whether a person is a fiduciary with respect to the particular activity in question.'") (quoting Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 61 (4th Cir. 1992)).

An insurance company does not become "an ERISA fiduciary merely because it handles claims under an employer's group policy."  Kerns, 992 F.2d at 216.  The insurance contract obligates the insurer to pay valid claims; however, it does not necessarily do so purely to provide benefits, as would be the case with an ERISA fiduciary.  Id. (citing 29 U.S.C. § 1104(a)(1) (stating that an ERISA fiduciary must "discharge his duties with respect to a plan solely in the

interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing bene-fits")).  The insurer may assume fiduciary obligations if a plan or policy so creates them, as when an insurance company is the plan administrator.  Id.  Also, an insurer who reviews appeals of denied claims is a fiduciary for that limited purpose.  Id.

In Prudential Insurance Co., the court determined that the insurer was a fiduciary for pur-poses of bringing suit under 29 U.S.C. § 1132(a).  Prudential Ins. Co. of America v. Doe, 140 F.3d 785, 789-90 (8th Cir. 1998).  In contrast to the insurer in Kerns, which "did nothing more than perform its normal contractual claims handling function," Prudential interpreted plan terms and reviewed the claim for benefits at every level.  Id. at 789-90.  Such tasks involved the exer-cise of "substantial discretion" and rendered the insurer a fiduciary.  Id. ("Department of Labor regulations view insurers as fiduciaries when they retain discretion to review denied claims").  In the case at bar, Coventry similarly went beyond an insurers's typical claims handling function.  Coventry not only processed Day's claim for benefits, it also actively and with discretion inter-preted the Plan term "experimental or investigational" in making a coverage decision.  When Day objected to that decision, Coventry reviewed the denial and handled all internal appeals under the Plan.  Accordingly, Coventry is a Plan fiduciary at least for the limited purpose of making benefits determinations and reviewing denied claims.

The Plan conferred upon Coventry authority to interpret the term "experimental or investigational."  The level of discretion granted, "sole and absolute," is sufficient to review this matter for abuse of discretion, and the language granting that authority was sufficiently explicit.  Accordingly, Coventry is entitled to a review of its benefits decision under an abuse of discretion standard unless Day has demonstrated that a sliding scale standard of review is applicable.

**B.    Standard of Review - Sliding Scale**

Day may obtain a less deferential standard of review if he "present[s] material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity

existed, which (2) caused a serious breach of the plan administrator's fiduciary duty." Woo, 144 F.3d at 1160.  If the two preconditions are met, the Court applies a sliding scale review, maintaining the abuse of discretion standard but proportionately decreasing deference to the administrator based on the degree of conflict or irregularity. Id. at 1161.

### 1. Palpable Conflict of Interest

Day asserts the appeal committee operated under a conflict of interest that caused it to ignore its duty to act in Day's best interest.  Two vice presidents, a staff appeals coordinator, in-house counsel, and a physician from an affiliated Coventry plan in Pennsylvania represented Coventry at the appeal hearing.[7]  The committee reconvened the next day and, according to the appeal file, held a "lengthy discussion" and "re-evaluated the Plan documentation" – including Day's supplemental materials and comments – before unanimously upholding the denial of benefits.  Day argues that the committee clearly operated under a conflict of interest because in effect it represented both Coventry and Day.  Given the amount of evidence Day presented that the OP-1 implant was not experimental or investigational and the members' employment with Coventry or its affiliates, Day asserts this conflict was resolved in the interest of Coventry and not in the interest of providing Day with the benefits for which he was eligible.  Therefore, he claims he has met his burden of producing "material, probative evidence" of a conflict.  Woo, 144 F.3d at 1160.

Where the same company serves as insurer and administrator, the Eighth Circuit has held that to be palpable evidence of a conflict of interest.  Torres v. UNUM Life Ins. Co. of America, 405 F.3d 670, 678 (8th Cir. 2005); see also Schatz v. Mut. of Omaha Ins. Co., 220 F.3d 944, 947-48 (8th Cir. 2000) ("As a general matter, when the insurer is also the plan administrator, we have recognized something akin to a rebuttable presumption of a palpable conflict of interest").

---

[7] Though Day's brief lists all parties present at the hearing, only the two vice presidents and physician were voting committee members.

However, de novo review is not required in every case where the insurer occupies this dual role: "[i]ndicia of bias can be negated by ameliorating circumstances such as equally compelling long-term business concerns that militate against improperly denying benefits despite the dual role." Schatz, 220 F.3d at 947-48 (internal quotations omitted).

"[T]he inquiry is fact specific and limited to instances where the relationship places the ERISA benefits plan administrator in a 'perpetual' conflict of interest." Davolt v. Executive Comm. of O'Reilly Auto., 206 F.3d 806, 809 (8th Cir. 2000). For example, no palpable conflict of interest existed where the insurer, who was also plan administrator, was a nonprofit entity[8] and thus did not have a direct profit motive in denying claims. Farley v. Arkansas Blue Cross and Blue Shield, 147 F.3d 774, 777 n.5 (8th Cir. 1998) (noting that ERISA itself contemplates fiduciaries not wholly neutral, such as an insurance company reviewing its own initial denial of benefits in accordance with 29 U.S.C. § 1108(c)(3)). A palpable conflict of interest was found where the singular corporate identity of plan insurer and administrator created a structural and financial conflict of interest and the corporation failed to articulate ameliorating circumstances. Schatz, 220 F.3d at 948.

Although it posits that it acted as both insurer and administrator, Coventry argues any resultant conflict does not warrant less-deferential review because it has shown ameliorating circumstances. Specifically, Coventry claims that although it may financially benefit in the short term by denying meritorious claims, in the long term such a policy would increase litigation expenses and ruin its reputation; therefore, it is in its best interest to pay meritorious claims. See Farley, 147 F.3d at 777 (plaintiff claimed insurer's desire to maintain competitive insurance rates encouraged it to deny claims and created a conflict of interest; court found "an insurer that routinely denies valid claims for benefits would have difficulty retaining current customers and

---

[8] Coventry Health Care of Iowa is listed with the Iowa Secretary of State as a domestic profit corporation.

attracting new business" in the long run); <u>Lawyer v. Hartford Life and Accident Ins. Co.</u>, 100 F. Supp. 2d 1001, 1009-10 (W.D. Mo. 2000) (agreeing that insurer/administrator's financial interest in the claim at issue – $65,000 – was minimal and "Hartford Life's long-term business goals would not be well-served by routine denial of valid claims for benefits").

Day counters that there is no evidence Coventry did not improperly consider financial motives and directs the Court to a case from a district court in North Carolina that found an inherent conflict where the plan administrator and insurer were one and the same, even in the absence of any evidence of conscious bias. <u>Foster v. State Farm Mut. Ins. Co.</u>, 843 F. Supp. 89, 92 (W.D.N.C. 1994). Such an opinion is not binding on this Court, but the Eighth Circuit already considers the dual roles played by Coventry in this case as indicators of bias. However, even if the Court assumes that the long-term harm in denying meritorious claim is not suffi- ciently ameliorative, deviance from the abuse of discretion standard of review is not warranted because Day has failed to demonstrate a serious breach of fiduciary duty. <u>Schatz</u>, 220 F.3d at 948 (in the absence of a serious breach of fiduciary duty, "[t]he mere fact of an 'unameliorated' structural conflict of interest does not necessarily warrant a less deferential standard of review'"). See Section I.B.3., below.

Day also states that courts have recognized the importance of allowing additional discovery regarding circumstances indicating conflict or bias, <u>Galm v. Eaton Corp.</u>, 360 F. Supp. 2d 978, 984-85 (N.D. Iowa 2005), and argues that additional discovery may be necessary if the record is unclear that the committee members were employees of Coventry or its affiliates who were presented with the task of simultaneously exercising fiduciary responsibilities toward Day and deciding whether to authorize company spending for the OP-1 procedure. Coventry notes that Day has not served any discovery and does not describe any discovery which may be appropriate.

In <u>Galm v. Eaton Corp.</u>, the case on which Day relies, Magistrate Judge Zoss actually denied discovery on the existence of a conflict of interest.  <u>Id.</u> at 985.  In addition, Coventry is not disputing the makeup of the committee or that denying Day's claim was financially beneficial in the short term.  Coventry is arguing that other ameliorating circumstances diminish the probable conflict of interest created by its position as plan administrator and insurer.  Consequently, the Court finds no need for additional discovery related to the existence of a conflict of interest.

The <u>Galm</u> court did permit additional discovery to determine the extent to which a conflict of interest affected the benefits decision.  <u>Id.</u> at 985-86.  In this regard, Day complains that the physicians mentioned in his supplemental materials may be considered "general recognized academic experts," and Coventry did not consult with them, instead relying on the advice of a medical expert who, although not employed by Coventry, was employed with an affiliated plan in Pennsylvania.  On this point, Day asks for additional discovery to have the Court examine evidence from those physicians.

Coventry states that any information provided by these physicians would be irrelevant because this Court is to determine if Coventry erred by considering "only the evidence that was before the administrator when the claim was denied."  <u>Farfalla v. Mut. of Omaha Ins. Co.</u>, 324 F.3d 971, 974-75 (8th Cir. 2003).  When the additional discovery is for the purpose of determining the standard of review, "limited discovery . . . does not run afoul of the general prohibition on admitting evidence outside the administrative record for the purpose of determining benefits."  <u>Galm</u>, 360 F. Supp. 2d at 985 (quoting <u>Farley</u>, 147 F.3d at 776-77 n.4).

The problem is that both parties assume any additional discovery would be inquiring into the substance of the physician's possible comments, and Day apparently seeks to use that to support the unreasonableness of Coventry's decision.  Such a use would not be to determine the standard of review, but would invite the Court to consider evidence outside the administrative

record in determining the merits.  The substance of the physician's potential comments is not necessary to determine the standard of review; therefore, as previously noted, the Court finds additional discovery would be irrelevant and thus futile.

### 2.   Serious Procedural Irregularity

Procedural irregularities will not warrant a less-deferential standard of review absent a showing that irregularities were such as to cause the Court to have "'serious doubt as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim,' or demonstrate that 'the actual decision was reached without reflection and judgment.'"  Neumann v. AT&T Commc'n., Inc., 376 F.3d 773, 781-82 (8th Cir. 2004) (citing Buttram v. Cent. States, SE & SW Areas Health & Welfare Fund, 76 F.3d 896, 900 (8th Cir. 1996)).  A court may infer an absence of reflection and judgment in cases "where the plan trustee does not inquire into the relevant circumstances at issue; where the trustee never offers a written decision, so that the applicant and the court cannot properly review the basis for the decision; or where procedural irregularities are so egregious that the court has a total lack of faith in the integrity of the decision making process."  Buttram, 76 F.3d at 900.

Day claims Coventry failed to "inquire into the relevant circumstances," Buttram, 76 F.3d at 900, because the appeal committee did not ask Day questions at the appeal hearing and no one contacted the physicians named in his supplemental materials.  Day also claims the information in his supplemental materials compels a finding of coverage for the OP-1 implant, so the decision to the contrary reveals that the alleged "lengthy discussion" and "re-evaluation" did not occur and the Court should find a lack of faith in the integrity of the process.  Finally, he claims the letter Coventry provided failed to adequately describe the reasons for the denial of benefits.

Coventry argues that Day was obligated to provide any information he considered relevant, and therefore it was not Coventry's responsibility to elicit further information.  Coventry

submits that no procedural irregularity occurred from its failure to ask questions or contact physicians because it was under no requirement to do so.

The Coventry argument is consistent with the rule that "[w]hen a plan places the burden on the claimant to provide necessary information, the claimant cannot shift the burden of investigation to the plan administrator." Sahulka v. Lucent Techs., Inc., 206 F.3d 763, 769 (8th Cir. 2000) (citing Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 46 (3d Cir. 1993)). In Sahulka, the Eighth Circuit discussed the responsibility of a plan administrator to investigate and verify information submitted by claimants. Sahulka brought an action for discretionary death benefits under her husband's employer's pension plan after the plan's benefits committee determined that she did not meet the financial need requirement. Id. at 766-67. Sahulka argued for a less deferential standard of review, alleging that the administrator did not perform a thorough investigation because it failed to properly investigate her financial condition, namely by not performing an independent verification of the information she provided on a financial disclosure form. Id. at 769.

Although the court acknowledged the general concept that "the lack of a thorough investigation by a fiduciary can result in a serious procedural irregularity requiring a less deferential standard of review," it nonetheless found that the administrator's claim processing procedures were adequate. Id. In so holding, the court noted that Sahulka had the assistance of counsel in preparing her claim and appeal, and the information she claimed the administrator should have discovered existed when she made the statements. Id. In addition, the plan explained the claims process and provided her opportunities to supplement the information provided. Id. Because the plan placed the burden on the claimant to establish financial need, Sahulka could not shift the burden of investigation to the administrator. Id. The court determined that "[i]n such cases, a rule compelling plan administrators to independently investigate and verify the information that

claimants submit would add substantial and unnecessary costs to the administration of ERISA plans." Id.  Accordingly, that court proceeded with abuse of discretion review.

Coventry appears to be correct that the Plan requires members to include supplemental information with an appeal.  Section 10.2 states "[t]he request for appeal *must* include" an explanation of the remedy sought and supporting documentation.  (Stipulated R. 68 (emphasis added).)  In addition, Day presented his case to the appeal committee with the assistance of counsel.  The appeal correspondence indicates Coventry informed Day of his right to present supporting materials and review relevant information.  (Stipulated R. 221.)  If Day thought these physicians had pertinent information, this procedure requires that Day provide it to the appeal committee.  It appears the committee entertained any information Day provided at the appeal hearing and the appeal process was handled according to the Plan provisions.  Nothing about the lack of questioning or investigation of the named physicians provides a basis for the Court to conclude the decision was made without reflection or judgment.

Day also contends that a serious procedural irregularity was evident even in the materials that were in front of the appeal committee, because Coventry gave an undue level of deference to its own internal technology assessment.  This evidences a complete disregard for Day's supplemental materials, he urges, requiring the Court to find that the absence of discussion and evaluation creates a lack of faith in the integrity of the decision making process.

Coventry asserts that it did consider Day's materials, but they did not meet the Plan's definition of "peer-reviewed literature" and thus did not demonstrate that the OP-1 procedure was not experimental or investigational.  As will be explained in greater detail in Part II, below, the Plan definition of experimental or investigational excludes procedures that are not considered standard treatment.  Whether a procedure is standard treatment, by Plan definition, is determined by reviewing peer-reviewed literature and generally recognized academic experts.  The Plan

definition of peer-reviewed literature excludes documents "sponsored to a significant extent by a pharmaceutical manufacturing company or health carrier."  (Stipulated R. 79.)

The documents Day provided the committee were from the OP-1 manufacturer and other health carriers.  Day claims it does not matter that the materials may not be "peer-reviewed literature" as defined in the Plan because the materials cast doubt on the accuracy of the evidence in Coventry's technology assessment.  However, it is not a serious procedural irregularity for Coventry to accord less weight to evidence that does not meet Plan definitions, and may contain a marketing agenda.

Day's final contention is that the explanation Coventry provided was inadequate in light of the evidence presented to the committee.  As previously noted, a court may infer an absence of reflection and judgment in cases "where the trustee never offers a written decision, so that the applicant and the court cannot properly review the basis for the decision."  Buttram, 76 F.3d at 900.  In addition, 29 C.F.R. § 2560.503-1(g)(1) requires the plan administrator to provide notice of an adverse benefit determination, which must contain,

> The specific reason or reasons for the adverse determination; [] Reference to the specific plan provisions on which the determination is based; [] A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; [and] A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review.

Coventry claims the February 4, 2005, letter explaining the decision fulfills its legal obligations under the regulations.  It further notes that the initial benefit decision must have been adequate because Day presented evidence at the appeal hearing trying to convince the committee that the OP-1 implant was not experimental or investigational, belying his claim that he was not adequately apprised of the reason for the benefit decision.

The February 4 letter states that the committee reviewed the file, including Day's materials, and determined that OP-1 was experimental or investigational.  The letter also provides the applicable Plan provisions and offers to provide copies of the appeal documentation to Day.  Day claims this "minimal" explanation and rationale does not fit the evidence available.  Whether the decision reflected in the letter is reasonable will be discussed further below, but nothing in the notice of benefit decisions Coventry provided Day constitutes a procedural irregularity

Accordingly, the Court finds none of Day's complaints with the Coventry appeal process amount to a serious procedural irregularity.  However, even if a procedural irregularity existed, the full abuse of discretion standard will still apply unless the irregularity was "so egregious that the court has a total lack of faith in the integrity of the decision making process." Buttram, 76 F.3d at 900.  Coventry has provided explanations for its decision that relate to the Plan terms.  This record reflects no procedural irregularities that rise to the level that this Court has a total lack of faith in the integrity of the decision making process.

### 3.   Serious Breach of Fiduciary Duty

Despite the absence of sufficient procedural irregularities, the Court did reserve the possibility that a conflict of interest may exist in this case.  Therefore, the final hurdle to the application of the sliding scale standard of review is the presence of a serious breach of fiduciary duty.  ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of participants and beneficiaries . . . and for the exclusive purpose of . . . providing benefits to the participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A)(I).  The standard to be exercised is that of a prudent person.  29 U.S.C. § 1104(a)(1)(B).  In addition, ERISA provides that these duties are to be exercised "in accordance with the documents and instruments governing the plan."  29 U.S.C. § 1104(a)(1)(D).

A serious breach of the administrator's fiduciary duty may be shown if "the conflict or procedural irregularity has 'some connection to the substantive decision reached.'" Woo, 144

F.3d at 1161 (quoting <u>Buttram</u>, 76 F.3d at 900).  It requires showing of "dishonesty, improper motive, or a complete lack of judgment."  <u>Hansen v. Actuarial and Employee Benefit Servs. Co.</u>, 395 F. Supp. 2d 881, 887-88 (D.S.D. 2005) (citing <u>Neumann</u>, 376 F.3d at 781).  To obtain a less-deferential standard of review, Day must present evidence that provides the Court with "'serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim,' or demonstrate that 'the actual decision was reached without reflection and judgment.'"  <u>Neumann</u>, 376 F.3d at 781-82 (citing <u>Buttram</u>, 76 F.3d at 900-01); <u>see also</u> <u>Heaser</u>, 247 F.3d at 833 (same).

According to Day, demonstrating "some connection" is not an onerous burden and one he easily meets.  Assuming the committee members were Plan fiduciaries, Day claims the failure to provide a neutral committee member and corresponding lack of independent medical review caused a breach of the duties of care, good faith, and loyalty.  He asserts that the inherent conflict of interest prevented committee members from exercising their fiduciary responsibilities because no fiduciary would have affirmed the denial of benefits in light of the evidence presented.  Thus the conflict of interest had "some connection" to a breach of fiduciary duty because the committee's choices were to either deny coverage of the OP-1 implant, providing a financial savings to the members' employer or affiliate, or to approve coverage of the implant and provide a medical benefit for a member in whose interest it was their duty as fiduciaries to act.  <u>See</u> <u>Woo</u>, 144 F.3d at 1161.

Coventry claims not every financial conflict warrants a less-deferential standard of review.  <u>See, e.g.</u>, <u>Davolt</u>, 206 F.3d at 809 (stating that the circuit did not "create a blanket rule mandating de novo review in all cases where the insurer of a health benefits plan is also the plan administrator"); <u>Woo</u>, 144 F.3d at 1161 n.2 (giving as an example the use of retrospective premiums to offset underwriting losses).  The Eighth Circuit has held that a denial of benefits based on a disagreement with plaintiff's medical expert is not a breach of fiduciary duty where the

insurer relies on "substantial evidence in the record, reports of outside medical reviews, and con-flicting evidence in [plaintiff's] submissions to the record."  Barnhart v. UNUM Life Ins. Co. of America, 179 F.3d 583, 589 (8th Cir. 1999).  This is because "fiduciary obligations extend pri-marily to the plan as it relates to all beneficiaries, not just to individual claimants."  Id. (citing Massachusetts Mut. Life Ins. v. Russell, 473 U.S. 134, 142 (1985)).  This duty requires proper inquiry into claims for benefits, as granting benefits to an unqualified claimant is a breach of the duty owed to all claimants.  Id.

Coventry claims Day was such an "unqualified claimant," and his arguments in this regard misapprehend Coventry's duty because a denial of benefits, where in accordance with Plan terms, is in keeping with its fiduciary duty owed to all Plan members.  Day counters that Coventry failed to conduct a proper inquiry into his claim for benefits, which was a breach of the fiduciary duty owed to him and all other Plan participants.

Day takes special exception to Dr. Braslow's participation in the committee.  Coventry accurately describes Dr. Braslow as the non-Coventry employee on the committee, but Day claims his employment with an affiliated Coventry plan carries an implication of bias such that his participation cannot be viewed as independent medical review.

Day cites the dissenting opinion of Judge Bye in Glenn v. Life Insurance Co. of North America for the proposition that "procurement of independent medical review is a key factor in deciding whether we should apply a less deferential standard of review in cases where the insurer is also the ERISA plan administrator."  Glenn, 240 F.3d 679, 681 (8th Cir. 2001).  However, the dissent's concern was that the insurance company did not procure independent medical review until after the initiation of litigation.  Id. at 682.  That is not the case here.

In addition, the cases cited by Judge Bye – Woo, Barnhart, and Schatz – involved claims where the medical condition of the plaintiff was at issue.  For example, in Woo, the court found the insurer breached its fiduciary duty by using only an in-house medical reviewer and not

obtaining a specialist to review the plaintiff's claim, where the plaintiff had an unusual disease

and the issue was whether she qualified for disability benefits.  Woo, 144 F.3d at 1161.  Here,

the medical status of Day is not at issue; the dispute is over the status or classification of the OP-

1 implant.  The parties do not parse this distinction or frame the debate this way, but the Court

notes that the peer-reviewed journals cited in the technology report are akin to independent

medical review of the implant, for here the claim turns on the classification of the treatment, not

the patient.

Finally, Day claims demonstrating a breach of the administrator's fiduciary duty is not a

heavy burden because Woo required only that "the conflict or procedural irregularity has 'some

connection to the substantive decision reached.'"  Woo, 144 F.3d at 1161.  They claim they have

easily demonstrated "some connection."  However, this second part of the Woo test is actually a

"considerable hurdle" for the Days.  Torres, 405 F.3d at 679 (stating "we are aware of only two

cases that have satisfied the second part of the Woo test").[9]  As recently as last year, the Eighth

Circuit described the test as follows:

> Torres presented no evidence that UNUM denied his claim because it was
> financially advantageous for it to do so.  Accordingly, he has not shown that
> UNUM's financial conflict of interest had a sufficient connection to the
> decision reached to trigger a departure from the abuse of discretion stan-
> dard.  The procedural irregularities we have discussed present a much closer
> case of a serious breach of UNUM's fiduciary duties.  However, cognizant

---

[9] Those two cases were Morgan v. Contractors, Laborers, Teamsters & Engineers
Pension Plan, 287 F.3d 716 (8th Cir. 2002) and Harden v. American Express Fin. Corp., 384
F.3d 498 (8th Cir. 2004).  In Morgan, the court found procedural irregularities that constituted a
breach of fiduciary duty where the trustees withheld information from the plaintiff before the
appeal hearing and made the benefits decision based on "preconceptions and personal observa-
tions."  Morgan, 287 F.3d at 722-23.  The trustees erred in voting "based on their predisposi-
tions rather than objectively analyzing evidence and employing proper judgment and reflection based
on such evidence."  Torres, 405 F.3d at 679.
    In Harden, the court found a serious procedural irregularity where the administrator
failed to obtain the plaintiff's Social Security medical records but misled the plaintiff to believe
that those records were part of the record it considered in denying him long term disability
benefits.  Harden, 384 F.3d at 499-500.

> of the considerable hurdle plaintiffs have in reaching this standard and
> realizing that virtually anything connected to an administrator's denial of
> benefits could be said to have "some connection to the substantive decision
> reached," Woo, 144 F.3d at 1161, we conclude that UNUM's decision is
> not subject to less deferential review.

Torres, 405 F.3d at 679.  Viewed as a whole, the record does not disclose a conflict or procedural

irregularity that indicates a lack of reflection or judgment.  After reviewing the record, the Court

does not have "serious doubt as to whether the result reached was the product of an arbitrary

decision or the plan administrator's whim."  Neumann, 376 F.3d at 781-82.  Accordingly, the

Court concludes the law requires review for abuse of discretion.[10]

### C.    Abuse of Discretion Review

Abuse of discretion review is deferential, but it is not a "rubber stamp" of the admin-

istrator's decision.  Torres, 405 F.3d at 680.  Instead, the administrator's decision is reviewed for

reasonableness.  Id.  In evaluating the reasonableness of an administrator's plan interpretation,

the Eighth Circuit employs a five-factor test:  "(1) whether the administrator's interpretation is

consistent with the goals of the Plan; (2) whether the interpretation renders any language in the

Plan meaningless or internally inconsistent; (3) whether the administrator's interpretation con-

flicts with the substantive or procedural requirements of the ERISA statute; (4) whether the

administrator has interpreted the relevant terms consistently; and (5) whether the interpretation is

contrary to the clear language of the Plan."  Id.  If, on the other hand, the Court is reviewing the

"administrator's evaluation of the facts to determine the application of the plan," the five-factor

test does not apply, and reasonableness is determined by whether the decision is supported by

substantial evidence.  Farley, 147 F.3d at 777 n.6.

---

[10] The Court notes that although it finds the case must be reviewed for abuse of discre-
tion, the sliding scale standard of review would not produce a different result because the degree
of any conflict or procedural irregularity would be so minimal as to result in only a slight
adjustment of deference to Coventry's decision.  See Woo, 144 F.3d at 1161.

Neither party argues for the application of the five-factor test in this case.  Accordingly, the Court must uphold Coventry's decision if it is supported by substantial evidence.  Substantial evidence is "more than a scintilla but less than a preponderance."  Schatz, 220 F.3d at 949.

## II.     DENIAL OF BENEFITS

Having determined the appropriate standard of review, the Court now proceeds to consider the denial of benefits under an abuse of discretion standard, which, as previously discussed, means the Plan administrator's decision will be upheld if it is reasonable, that is, if it is supported by substantial evidence.  Ortlieb v. United HealthCare Choice Plans, 387 F.3d 778, 781 (8th Cir. 2004).  Substantial evidence is evidence that a reasonable person might find sufficient to support the decision made.  Id.  It is not necessary that a reasonable person would have come to the same conclusion, only that he could have.  Ferrari, 278 F.3d at 807; Cash v. Wal-Mart Group Health Plan, 107 F.3d 637, 641 (8th Cir. 1997).

"This deferential standard reflects our general hesitancy to interfere with the administration of a benefits plan."  Layes v. Mead Corp., 132 F.3d 1246, 1250 (8th Cir. 1998).  "Under such standard, a reviewing court should consider only the evidence before the plan administrator when the claim was denied."  Heaser, 247 F.3d at 833.

All parties agree that Coventry denied Day's claim because it considered the OP-1 implant to be "experimental or investigational."  Coventry claims its decision to deny coverage of the OP-1 implant was reasonable because (1) it relied on its internal health care technology assessment,[11] which found the implant was experimental/investigational; (2) the materials submitted by Day did not refute the findings of the technology assessment; and (3) its explanation of the denial was adequate.  Day argues the evidence he presented demonstrated that the OP-1 implant was not experimental or investigational within the Plan definition, so Coventry's determination to the contrary was unreasonable and its explanation was inadequate.  The Court notes

---

[11] Coventry's internal technology assessment regarding OP-1 was created in August 2002 and revised in February 2003, September 2003, and September 2004.

that Day's arguments in this regard repeat many of his points raised in determining the standard

of review.

The Plan definition of experimental or investigational includes the following:

- Any drug not approved for use by the FDA; any drug that is classified
  as IND (investigational new drug) by the FDA; any drug requiring pre-
  authorization that is proposed for off-label prescribing.

- Any health product or service that is subject to Investigational Review
  Board (IRB) review or approval.

- Any health product or service that is the subject of a clinical trial that
  meets criteria for Phase I, II, or III as set forth by FDA regulations.

- Any health product or service that is not considered standard treatment
  by the medical community, based on clinical evidence reported by
  peer-review medical literature and by general recognized academic
  experts.

(Stipulated R. 75-76.)

Coventry does not claim that the OP-1 implant required Investigational Review Board

review, so the second definition need not be considered.  It is not clear from the record if the OP-

1 implant could be considered a "drug" for purposes of the first definition or whether it is the

subject of a clinical trial for purposes of the third definition; but those definitions are not placed

at issue by either party.  Day claims any consideration of FDA approval weighs in his favor

because the FDA approved the OP-1 implant under a "humanitarian use device" exemption.

Coventry does not deny that the OP-1 implant received the exemption and includes final

approval by governmental regulatory bodies as one factor in formulating its technology assess-

ment.  However, Coventry's technology assessment found that humanitarian use exemptions are

designed to encourage research and development of treatments affecting only small numbers of

patients; and the exemption only requires proof that the device is safe for the patient.  Accord-

ingly, Coventry claims it was entitled to consider that the device had only been approved based

on its safety in considering whether the device was considered standard treatment by the medical

community under the fourth definition.  It is this fourth definition upon which Coventry con-

centrates its argument that the OP-1 procedure was experimental or investigational.

Day provided Coventry a letter from Kathryn Barry,[12] the Health Policy Specialist for

Stryker Biotech, the manufacturer of the OP-1 implant, in which she discussed the current uses

of the OP-1 implant in the medical community.  Barry urged Coventry to contact several

physicians with experience using the OP-1 implant and said, "Coventry Health Care of Iowa's

initial assessment of OP-1 Implant [sic] is not in step with contemporary orthopedic practice . . .

and is contrary to the technology assessments already conducted by leading payers."  (Stipulated

R. 180.)  Day claims Coventry was not reasonable in failing to contact the physicians referenced

in Barry's letter and not following the technology assessments of other insurance companies.

Coventry claims Barry's letter did not contradict its findings because the Plan definition

of standard medical treatment requires reference to peer-reviewed journals and recognized medi-

cal authority.  Coventry notes that Barry worked for the manufacturer of OP-1, and her letter and

documents from other insurers were not journals or medical authorities.  As such, Coventry

argues it was under no obligation to defer to the assertions in Barry's letter.  In fact, the Plan

definition of peer-reviewed literature, at least by analogy, specifically excludes publications

"sponsored to a significant extent by a pharmaceutical manufacturing company."  (Stipulated R.

79.)  Finally, Coventry asserts that Barry's letter actually supports its determination that the OP-

1 implant was not standard treatment because she refers to OP-1 several times as an alternative

when "conventional practices" for treatment have failed.  (Stipulated R. 181-82.)

Day provided Coventry with a letter from an affiliated plan, Southern Health, which

stated that the plan reversed its initial determination and made an exception to the plan

---

[12] Day's brief refers to Barry as a physician, although she is actually a nurse.  Counsel
confirmed at oral argument that the reference was a clerical error, and Day does not contend that
she is a physician.

approving an OP-1 implant for one of its members.  (Stipulated R. 188.)  Day claims this demon-

strates Coventry was unreasonable in denying coverage of the OP-1 implant.  Coventry correctly

notes that the letter does not indicate the affiliated plan considered the OP-1 implant standard

treatment or state upon what plan term the coverage was originally denied, other than to note the

decision to approve the implant was an exception to the plan terms.  According to Coventry, the

fact that the letter refers to the decision as an "exception" implies that this procedure was not

normally covered under the affiliated plan either.  Although Day claims the same complaints

Coventry raises about this letter are equally applicable to its own correspondence, the letters sent

from Coventry to Day state the reason for the benefits denial (experimental or investigational)

and recite the applicable Plan sections.

Coventry claims that the internal guidelines from other insurers also failed to demonstrate

that the OP-1 implant is standard treatment.  It notes that Day sought coverage under the terms of

the Waldinger Plan, which it had discretion to interpret.  It also notes that the guidelines from

other insurers caution the members that their particular plan might not cover a procedure, even if

the guidelines indicate it is medically necessary, depending on how individual plans define

covered services.  (Stipulated R. at 190, 193.)  Finally, Coventry notes that the Plan definition of

peer-reviewed literature specifically excludes publications "sponsored to a significant extent by a

. . . health carrier."  (Stipulated R. 79.)

In determining whether OP-1 was standard medical treatment, Coventry also considered

if the scientific evidence allowed for conclusions as to the effectiveness of the implant on health

outcomes.  In accordance with the Plan definition of standard treatment "based on clinical

evidence reported by peer-review medical literature and general recognized academic experts,"

Coventry consulted peer-reviewed journals, in particular an article from the 2003 <u>Journal of

Bone & Joint Surgery</u>, which found "[t]he optimal BMPs to be used in different clinical appli-

cations have not been elucidated, and a comprehensive evaluation of the relative osteogenic

activity of different BMPs is lacking."  Coventry incorporated that finding, as well as similar

statements from other journals, into its technology assessment and determined that there was

insufficient scientific evidence to make a conclusion as to the effectiveness of the OP-1 implant.

In Ortlieb, the Eighth Circuit upheld a denial of benefits based on a policy exclusion for

experimental or investigational treatment when three of the four reviewing physicians found a

lack of peer-reviewed literature supporting the use of the treatment in question.  Ortlieb, 387

F.3d at 783-84 (however, not as many unaffiliated physicians reviewed Day's claim).  Day did

submit a peer-reviewed article by Dr. Gary Friedlaender, which Barry referenced in her letter as

proving that the OP-1 implant was as effective as bone autograft treatment.  Coventry claims this

article did not establish OP-1 as standard treatment because it acknowledged that the OP-1

implant was relatively new and addressed one of the first clinical studies.  In addition, the article

addressed OP-1 in treatment of tibial nonunion, whereas Day requested OP-1 for treatment of

nonunion of his subtalar joint.

Coventry maintains it was under no obligation to contact the physicians named in Barry's

letter.  First it claims if Day had relevant information, it was his duty to present it to the com-

mittee.  If the Plan obligates the member to provide information, he or she cannot impose a

burden on the Plan to investigate.  Sahulka, 206 F.3d at 769.  This argument has already been

addressed in Part I.B.2., supra.  In addition, the Eighth Circuit has previously held that a district

court erred in admitting additional evidence outside the administrative record because the plain-

tiff failed to show good cause for admitting the evidence and because it was incumbent upon the

plaintiff to obtain and submit evidence if he believed it was necessary for the insurer to have in

making its determination.  Brown v. Seitz Foods, Inc. Disability Benefit Plan, 140 F.3d 1198,

1201-02 (8th Cir. 1998).

Day also claims the explanation Coventry provided was inadequate in light of the

evidence presented to the committee.  The February 4, 2005, letter explaining the decision states

that the committee reviewed the file, including Day's materials, and determined that OP-1 was experimental or investigational.  The letter also provides the applicable Plan provisions and offers to provide copies of the appeal documentation to Day.  Day claims this "minimal" explanation and rationale does not fit the evidence available.  Coventry claims the letter met its legal obligations and that there is no evidence of undue haste in decision making process.  Day has not presented evidence, beyond that already discussed above, that Coventry's notice letter was legally inadequate.  (Stipulated R. 175-75.)  This issue has been previously considered, and the Court finds no pertinent legal inadequacy with the notice.  Accordingly this does not provide the Court with any reason to find Coventry's decision unreasonable.

Day goes to great lengths to demonstrate that the OP-1 implant procedure was medically necessary.  This does not provide the Court with the ability to find Coventry's decision unreasonable, however, because the Plan provides that medical necessity is not enough to warrant coverage.  Under section five, "Covered Services," the Plan clearly states that it covers "only those health services . . . that are (1) deemed Medically Necessary, (2) coordinated through Your Primary Care Physician and provided by a Participating Provider . . . and (3) not excluded under the Exclusions and Limitations set forth in Section 6."  (Stipulated R. 33.)  Accordingly, even if the Court were able to find that the OP-1 procedure was medically necessary, an issue not now presented, it would additionally have to find that Coventry was unreasonable in finding the procedure experimental or investigational.  This the Court cannot do.

The abuse of discretion standard of review does not permit the Court to rule based on what it would have done in the same circumstances.  Coker v. Metro. Life Ins. Co., 281 F.3d 793, 797 (8th Cir. 2002) ("A plan administrator's discretionary decision is not unreasonable merely because the reviewing court disagrees with it").  The administrator's "decision is not unreasonable merely because 'a different, reasonable interpretation could have been made.'" Parkman, 439 F.3d at 773.  This deferential standard reflects the court's hesitancy to interfere

29

with the administration of plan benefits.  Heaser, 247 F.3d at 833.  Although it might have been reasonable to authorize a plan exception here, or to give different weight to the peer-reviewed journal articles, such sentiments do not provide the Court with a basis upon which to find that the Coventry decision was unreasonable.  Accordingly, the Court finds that Coventry did not abuse its discretion.  The decision denying coverage of the OP-1 implant must be upheld.

## CONCLUSION

The Plan granted Coventry discretionary authority to construe the Plan term "experimental or investigational."  Accordingly, the Court does not review Day's claim de novo.

Although a conflict of interest may be argued at some level, Coventry has presented some evidence of ameliorating circumstances.  In addition, even if a conflict or procedural irregularities are present, there has been no serious breach of fiduciary duty.  A sliding scale standard of review is not applicable, and the Court applies an abuse of discretion review.

Because of the level of deference inherent in abuse of discretion review, and because Day has failed to demonstrate the unreasonableness of Coventry's decision, the Court affirms the decision of Coventry finding OP-1 an experimental or investigational procedure not covered under Day's health plan.  Accordingly, the above-entitled action must be **dismissed**.  The Clerk of Court is directed to enter judgment for the Defendant.

**IT IS SO ORDERED.**

Dated this 24th day of October, 2006.

JAMES E. GRITZNER, JUDGE
UNITED STATES DISTRICT COURT